E-FILED
Wednesday, 29 January, 2025  05:00:59 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

FILED

SIXTH JUDICIAL CIRCUIT

10/10/2024 11:47 AM
By: LE

Susan W. McGrath

CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY, ILLINOIS

### STATE OF ILLINOIS
### IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
### CHAMPAIGN COUNTY

| | | |
|---|---|---|
| RACHEL CAPRIGLIONE, as natural mother and next friend of A.T., a minor, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 21-L-176 |
| THE PAVILION FOUNDATION d/b/a THE PAVILION BEHAVIORAL HEALTH SYSTEM, | ) ) ) ) | |
| Defendant. | ) ) | |

## <u>Judgment Order</u>

This case is about the forcible rape of a 13-year-old patient by another juvenile patient, when both were under the care and custody of the Pavilion. Throughout this litigation, the Pavilion has denied liability. During closing arguments, it argued to the jury that the rape occurred solely because of the assailant and that "it didn't happen" because of any negligence by the Pavilion. (3/28/24 Tr. at 51.) The jury, which awarded the plaintiff a total of $535 million ($60 million in compensatory damages and $475 million in punitive damages), clearly disagreed.

Now before the Court are the Pavilion's post-trial motion and the plaintiff's post-trial motion for costs. The Pavilion seeks judgment notwithstanding the verdict, a new trial, and/or the remission of damages. The plaintiff asks for costs, prejudgment interest, and postjudgment interest.

I

This is a difficult case with disturbing facts. (*See* 3/12/24 order.) This order is not intended to be a comprehensive recapturing of the expansive factual record developed at trial and only seeks to address the parties' post-trial motions. Nevertheless, some background is necessary.

The Pavilion is a mental health hospital with an inpatient pediatric unit and holds itself out as offering "a secure, structured environment." (P. Ex. 15-2.) Testimony from those who worked there, along with video from the night of the December 5, 2020, told a different story.

The pediatric unit is primarily staffed by two types of employees: nurses and mental health techs (MHTs). Nurses are generally in the nurse's station where they are checking charts and processing new admissions. They leave the nurse's station primarily to do rounds and distribute medication. Lisa Creed, the interim chief nursing officer on December 5, 2020, estimated that during a typical eight-hour shift a nurse may be out of the nurse's station between "30 minutes to an hour." (3/25/24 Tr. at 259-261.) Meanwhile, MHTs are "not qualified or licensed to provide psychiatric or behavioral therapy to patients" and are only require to possess a high school education for the role. (3/22/24 Tr. at 252; 3/20/24 Tr. at 150.) Christopher Echols, a supervising MHT at the Pavilion, testified that in December 2020 the primary responsibility of MHTs was performing "flow checks and monitoring the kids on the unit to make sure they weren't hurting themselves or others." (3/22/24 Tr. at 255-256.)

Cynthia Clark, a former nurse on the pediatric unit, testified, "there was some sort of incident" almost every day and that "fights between patients or a patient attacking staff . . . was pretty much a daily occurrence." (3/21/24 Tr. at 241.) Ms. Clark said the unit was chronically understaffed. (*Id.* at 242.) Taylor Wallis, who worked as an MHT on the pediatric unit in 2017 and 2018, also testified that the unit was not adequately staffed: "Towards the end of my time there, there were much more frequent fights between patients. So, we would want to have enough mental health techs to break that up. But then if we didn't have enough mental health techs, the fights were more frequent, almost daily towards the end." (3/20/24 Tr. at 123.) Ms. Wallis said she "decided to leave" when "people [were] just getting hurt more frequently" and after an incident where another MHT was "jumped" by two patients. (*Id.* at 125.) Julius Grice, an MHT at the Pavilion from 2018 to 2020, said he generally worked in the adult unit but would be called to the pediatric unit for a support code — "to help de-escalate the situation and kind of gain control over the unit." (3/21/24 Tr. at 17.) In Mr. Grice's experience the pediatric unit was "often" understaffed. (*Id.* at 31-32.)

In addition to nurses and MHTs, the Pavilion had multiple security cameras on the unit with the footage displayed in real time on screens in the nurse's station. (3/25/24 Tr. at 257.) According to Ms. Creed, the "cameras were there to observe patient activity." (*Id.* at 262.) However, Ms. Creed testified that in a monthly safety meeting with the CEO and risk manager, it was decided that no one needed to monitor the cameras. (*Id.* at 258-261.) Alan Creamean, the risk manager, admitted

3

no one was assigned to monitor the cameras, they were only a supplement to staff's observations, but if a camera was obscured the staff were supposed to "observe the environment to see if there's any kind of behaviors that are concerning to them." (Creamean Dep. at 218, 235.)

According to Mr. Creamean, the Pavilion's policies and procedures required the staff to continuously monitor the hallways. (Creamean Dep. at 187.) When asked how the staff could see the hallways if they were in a room helping a patient, Mr. Creamean testified, "I guess it depends on how you define that continuous monitoring." (*Id.* at 211.) Nurses who worked on the unit consistently asked for increased staffing. Ms. Clark said she "complained to everybody up the chain" about understaffing. (3/21/24 Tr. at 242-243.) Another nurse, Generosa Berango, testified that the understaffing made her job difficult and she reported her understaffing concerns to her higher-ups, including the chief nursing officer Ms. Creed, through evaluation forms. (3/22/24 Tr. at 88, 92-94; *see also* P. Ex. 20-4 at 396, 414, 421, 429.) Ms. Creed testified that she did not set the staffing policy ratios. (3/25/24 Tr. at 247.) Instead, she said the staffing levels were "handed down" from the Pavilion's corporate parent Universal Health Services (UHS). (*Id.* at 248.)

On November 30, 2020, Ms. Creed wrote that it was her goal to "develop a plan to improve the Pavilion safety culture." (3/25/24 Tr. at 284; *see also* P. Ex. 20-6 at 9.)

That same day, A.T. was admitted to the Pavilion. (*Id.* at 285.) Her mother, Rachel Capriglione, testified that A.T. was having mood regulation problems that manifested in anger, throwing things, screaming, and suicidal ideations. (3/25/24 Tr.

at 157, 162.) On November 30, Ms. Capriglione took her daughter to a local hospital and workers there referred them to the Pavilion. (*Id.* at 168-169.) After Ms. Capriglione talked with someone at the Pavilion, who she said assured her that males and females would not be housed by each other, she sent her daughter to the Pavilion where she was admitted. (*Id.* at 170-171.)

Four days later, December 4, 2020, another patient, 16-year-old D.C., was admitted to the Pavilion after he "fled from his group home . . . by punching out a window and jumping from the second story of the home." (3/22/24 Tr. at 33; *see also* P.Ex. 10-1084.) His admitting records indicate that he "is aggressive towards peers" and staff. (*Id.*) The facility he left warned that he "[r]equires close observation as this has been a culmination of a pattern of intensifying dangerous impulsive behavior." (*Id.* at 60; *see also* P.Ex. 10-1085.) The Pavilion recognized, in an evaluation dated December 4, 2020, that D.C. "has conflicts with peers because he wants to do what he wants to do and when he wants to do it and does not like to listen to others." (P. Ex. 10-1037.)

Upon admission, 16-year-old D.C. was placed in the room next to 13-year-old A.T. The Pavilion did not have a policy prohibiting the placement of female pediatric patients next to male patients. (3/22/24 Tr. at 28.) According to Ms. Creed, male and female patients were regularly housed next to each other depending, in part, on bed availability. (3/25/24 Tr. at 269-270.) Mr. Echols, a supervising MHT, testified that they generally attempted to separate girls from boys but, depending on the patient population, "a patient may be placed in whatever rooms are available." (3/22/24 Tr.

at 254, 270-271.) Ms. Berango, the nurse on duty the night of the attack testified, "generally, we separate the boys from the girls" but "there are instances [when a] girl patient might also be beside a male patient." (3/22/24 Tr. at 27.) She said she had safety concerns about housing boys next to girls and that if that happened "staff should be watching carefully." (*Id.* at 26.) In her opinion, D.C. should not have been placed next to A.T. (*Id.* at 61.)

The video footage from December 5, 2020, is damning. Mr. Harper, one of the MHTs on duty that night, testified that lights out was at "around 9 p.m." and the kids were supposed to be in their beds by then. (3/20/24 Tr. at 158.) Yet D.C. can be observed well after lights out engaging in erratic and aggressive behavior. He can be seen running up and down the halls, at one point dragging Mr. Harper behind him. He and another juvenile male patient (referred to as "the accomplice" at trial) repeatedly obscured security cameras with toothpaste in the hour leading up to the rape. No one at the Pavilion seemed alarmed that the cameras were obscured or took steps to see if something was afoot. Julia Bleich, an MHT who took over for Mr. Harper after his shift ended, testified that while she noticed the cameras were fuzzy that night, she did not do anything about it "[b]ecause it wasn't my job to look at the cameras." (3/26/24 Tr. at 79-80.) Ms. Berango saw the cameras were blurry sometime after midnight. (3/22/24 Tr. at 79.) She said she called the house supervisor about the obscured cameras but nothing was done about it during her shift. (*Id.* at 83-84.) It was not until Mr. Echols reported for work the next morning that he noticed the toothpaste and cleaned the cameras. (*Id.* at 283.)

Confronted with the video footage, Mr. Harper admitted he had lost control of the situation. (3/20/24 Tr. at 311.) Shortly after 11 p.m., two hours after lights out, D.C. lured A.T. into his room, where he attacked her. When A.T. left the room she had blood on her hands and clothes. (3/22/24 Tr. at 172.) When she encountered Ms. Bleich, A.T. told her that she had started her period. (*Id.* at 172; 3/26/24 Tr. at 62-63.) However, on the morning of December 7, A.T. told Ms. Clark that she had been raped, that she was hurt, and that she was still bleeding. (3/21/24 Tr. at 208.) Ms. Clark testified that she observed marks on A.T.'s arms consistent with her having "been grabbed real hard." (*Id.* at 209.) Ms. Clark documented her observations of A.T. (*Id.* at 216-220; P. Ex. 10-219, 10-220, 10-223.) A.T. was taken to a local hospital where a SANE kit was performed, confirming the rape. (3/25/24 Tr. at 40, 286, 288; P. Ex. 40-2.) That report indicated she had "bruises on her knees, abdominal, [and] vaginal pain." (3/25/24 Tr. at 41.)

After the attack, the operation of the pediatric unit apparently continued as usual. Ms. Clark testified that she resigned after the incident because "nothing changed at all, nothing changed, and I feared for my license." (3/21/24 Tr. at 243.) Ms. Creed admitted that nothing changed about staffing ratios, the patient room placements, or the number of cameras being monitored after the assault on A.T. (3/25/24 Tr. at 316.)

II

The Pavilion's post-trial motion contains three parts. First, it argues that it is entitled to judgment notwithstanding the verdict. Second, and alternatively, it asks the Court to grant a new trial. Third, and only if the Court rejects both of those arguments, the Pavilion claims that the damages are excessive and should be remitted.

A

The Pavilion believes it is entitled to judgment in this case because, in their view, the facts only implicate healing arts malpractice and not ordinary negligence. Further, because Illinois law prohibits punitive damages in medical malpractice cases, the Pavilion argues that the punitive damages award must be set aside. *See* 735 ILCS 5/2-1115. These arguments are well-trodden in this case, most notably at the summary judgment hearing on February 26, 2024. (2/26/24 A.M. Tr. at 70-77, 121-125. *See also* section II of the 3/12/24 order.)

"Not every injury sustained by a patient in a hospital results from healing art malpractice." *Heastie v. Roberts*, 226 Ill. 2d 515, 551 (2007). While healing arts judgments form a large part of what a hospital does, such judgments "do not constitute the entirety of a hospital's function." *Edelin v. Westlake Comm. Hosp.*, 157 Ill. App. 3d 857, 862 (1st Dist. 1987). A hospital also has "administrative and management duties," primarily related to safety. *Heastie*, 226 Ill. 2d at 553. These "safety related" duties exist so that a patient cannot "effect an escape, inflict harm on himself or others, or destroy property." *Id.* Violations of such "custodial shelter care"

duties are "not inherently one of medical judgment" and sound in ordinary negligence. *Owens v. Manor Health Care Corp.*, 159 Ill. App. 3d 684, 688-89 (4th Dist. 1987).

This Court has already found that the gravamen of the harm in this case — the rape of a 13-year-old girl — was akin to the harm in *Kaufmann v. Schroeder*, 241 Ill. 2d 194 (2011), where a sexual assault of a patient by a doctor during a purported medical exam was found not to arise out of patient care. (2/26/24 A.M. Tr. at 73-74.) The Court also found that, like the safety-related measures in *Heastie*, the failure to monitor the security cameras, failure to investigate the toothpaste on the cameras, failure to adequately monitor the patients, especially when they housed boys and girls next to each other, did not invoke a healing arts judgment. Instead, those failures implicated the administrative and management duties of the Pavilion in providing its patients a safe place to sleep at night. (2/26/24 A.M. Tr. at 74-76.) Finally, the Court allowed the plaintiff to seek punitive damages because the evidence in this case is sufficient for a fact-finder to conclude that the Pavilion's "conduct was so grossly negligent as to indicate a wanton disregard." *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 813 (2016). (2/26/24 A.M. Tr. at 123-125.)

That the Pavilion disagrees with this Court's pre-trial rulings is not new. Now post-trial, the Pavilion continues to argue, with significant reliance on *Neade v. Portes*, 193 Ill. 2d 433 (2000), that the plaintiff's allegations of healing arts malpractice and ordinary negligence derive from the same operative facts and, therefore, can only support a healing arts malpractice claim. In *Neade,* the Illinois Supreme Court affirmed the trial court's dismissal of a fiduciary duty claim against

9

a doctor because it was "duplicative of the medical negligence claim." *Id.* at 445. But again, and unlike the duplicative duties in *Neade*, the Pavilion has administrative and management duties *separate and distinct* from its healing arts duties.

Moreover, the Pavilion reasserting the same arguments about the allegations in this case and their legal sufficiency is not the standard for judgment notwithstanding the verdict. A judgment notwithstanding the verdict is appropriate "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on the evidence could ever stand." *Pedrick v. Peoriat & E. R.R. Co.*, 37 Ill. 2d 494, 510 (1967). "A trial court cannot reweigh the evidence and set aside a verdict merely because the jury could have drawn different inferences or conclusions, or because the court feels that other results are more reasonable." *Maple v. Gustafson*, 151 Ill. 3d 445, 453 (1992). Here the evidence was overwhelmingly against the Pavilion. Despite the fact that the Pavilion contested it, this was not a close case on the issue of liability.

The Pavilion repeatedly points to the testimony of Dr. Loretta Ann Sonnier, who testified on March 21, 2024. The Pavilion argues that Dr. Sonnier's testimony "proves" that this case fits *only* under the rubric of health arts malpractice because she testified what an institution like the Pavilion should do. (Reply filed 7/23/24 at 5-6.) Dr. Sonnier is a child and adolescent forensic psychiatrist and most recently has worked as "medical director" for behavioral health for Children's Hospital of New Orleans and then as "the behavioral health medical director" for Amerihealth Caritas

Louisiana. (3/21/24 Tr. at 65.) That she testified does not cabin this case to medical malpractice. Again, the administrative and management duties of a hospital, which a director of such a facility would be cognizant of, are not duplicative of its healing arts duties.

Dr. Sonnier's testimony was that if male and female teenage patients are going to be housed next to each other "they need the proper supervision and monitoring in place." (3/21/24 Tr. at 98.) She was critical of the Pavilion: "I mean, no one is supervising. The kids are out of their room, they shouldn't even be out of their room, and they're doing whatever they want without somebody watching them." (*Id.* at 92.) She continued: "They put the surveillance cameras there for a reason, so there should be somebody watching them. In every facility that I've worked in there's somebody always manning the cameras and watching the cameras." (*Id.* at 111-112) Dr. Sonnier believed the Pavilion was "setup for something bad to happen" and that "appropriate supervision and monitoring could have avoided this happening." (*Id.* at 115-116.) While she holds a medical degree and is a medical director, Dr. Sonnier also believed a "lay person" would recognize it is "not a good idea" to have "30 kids between the ages of 4 and 17 that have behavioral health issues" be supervised in the manner done by the Pavilion. (*Id.* at 146.)

The Court agrees with Dr. Sonnier, and rejects the Pavilion's cherrypicked characterization of her testimony. It does not take an expert to recognize that the Pavilion's choice to house pediatric patients in the manner it did was doomed to fail. "Custodial shelter care must be distinguished from medical treatment." *Owens*, 159

11

Ill. App. 3d at 688. In such a case, "[e]xpert testimony from a health-care professional is not required to assess the acts of the defendant." *Id.* While expert testimony was not *required* by the plaintiff, it does not follow that such testimony was *prohibited* or that such testimony converts ordinary negligence into healing arts malpractice. The fact that plaintiff chose to present expert testimony does not mean the evidence so overwhelmingly favored the Pavilion "that no contrary verdict based on the evidence could ever stand." *Pedrick v. Peoria & E. R.R. Co.*, 37 Ill. 2d 494, 510 (1967). Instead, the facts at trial overwhelmingly demonstrated the Pavilion's negligence allowed one of their patients to violently rape another. This was in the ken of both expert and non-expert alike. The Pavilion is not entitled to judgment notwithstanding the verdict.

B

Next, the Pavilion argues that it is entitled to a new trial. "A new trial should be granted only when the verdict is contrary to the manifest weight of the evidence." *York v. Rush-Presbyterian-St. Luke Med. Ctr.*, 222 Ill. 2d 147, 178 (2006). "A verdict is contrary to the manifest weight of the evidence when the opposite conclusion is clearly evident or when the jury's findings prove to be unreasonable, arbitrary and not based upon any of the evidence." *Id.* at 179. The Pavilion argues it is entitled to a new trial for two reasons.

1

First, the Pavilion argues that the Court erred in instructing the jury. Illinois courts recognize that "civil litigants are entitled to have the jury instructed on the

12

issues presented, the applicable legal principles, and the facts that must be proved to support a verdict." *Bailey v. Mercy Hosp. & Med. Ctr.*, 2021 IL 126748, ¶ 41. "While the threshold for permitting an instruction in a civil case is modest, the standard for reversing a judgment based on failure to permit an instruction is high. The decision as to which jury instructions to use falls within the discretion of the trial court." *Heastie*, 226 Ill. 2d at 543. Having re-read the instructions given to the jury, the Court does not believe it abused its discretion in how it instructed the jury.

The Court instructed the jury that the plaintiff claimed the Pavilion was "negligent in one or more of the following respects:" (a) failed to safely house patients on the unit; (b) failed to provide adequate staffing; (c) failed to properly monitor the adolescent unit; or (d) failed to monitor its surveillance cameras. (Jury Instruction 14.) The Pavilion argues that this instruction wrongly imposed strict liability on it. This claim is false. The jury instructions must be read as a whole. The Court also instructed the jury that it was only *negligent* failures that subjected the Pavilion to liability, not *any* failure. (Jury Instruction 13.) The jury was also properly instructed as to the definition of "negligence." (Jury Instruction 9.)

It was also not necessary to ask the jury, through special interrogatories, which of the plaintiff's theories of negligence it found proximately caused the injuries. The jury returned a general verdict of negligence against the Pavilion. "If several grounds of recovery are pleaded in support of the same claim, whether in the same or different counts, an entire verdict rendered for that claim shall not be set aside or reversed for the reasons that any ground is defective, if one or more of the grounds is sufficient to

sustain the verdict." 735 ILCS 5/2-1201(d). In other words, "[w]hen there is a general verdict and more than one theory is presented, the verdict will be upheld if there was sufficient evidence to sustain [any] theory." *Dillon v. Evanston Hosp.*, 199 Ill. 2d 483, 492 (2002) (quoting *Witherell v. Weimer*, 118 Ill. 2d 321, 329 (1987)). The evidence was more than sufficient to establish liability.

The Pavilion is also wrong in contending that the Court erred in giving the Illinois Pattern Instruction 15.01 on the issue of proximate cause. (*See* Jury Instruction 8.) "Supreme Court Rule 239(a) requires that whenever Illinois Pattern Jury Instructions (IPI) contains an instruction applicable in a civil case, giving due consideration to the facts and the prevailing law, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that the pattern instruction does not accurately state the law." *Studt v. Sherman Health Sys.*, 2011 IL 108182, ¶ 14. Without a higher court instructing the trial courts that an IPI does not accurately state the law, it cannot be an abuse of discretion to give the relevant IPI. Therefore, the Pavilion's jury instruction arguments are unavailing.

2

Second, the Pavilion claims that "prejudice," primarily caused by plaintiff's counsel's closing argument, requires a new trial. The Pavilion complains about the following portions of argument. In openings, plaintiff's counsel told the jury: "The whole purpose of . . . punitive damages is to speak loudly enough with your verdict to

14

let the industry hear and take note to deter this everywhere." (3/20/24 Tr. at 62.) In

closing, plaintiff's counsel made the following arguments:

> I told you in the very beginning that this is an important case and the decisions that you make can make a real difference. I hope that you see that, that you see that now, not just here but at the thousands of facilities like this across the country and the tens or hundreds of thousands of patients that go there for help, that are entrusted to them.
>
> I've lived with this case, like I said, and this conduct for years and all of that was to get here now and give it to you to put a stop to what we've seen in this case and to stop it everywhere. I'm not asking you to base any of your decision in this case on passion. I'm asking you to base your decisions in this case on logic and on reasoning and based on the evidence that you are — that you have seen and the instructions that the Court is going to give you.

(3/28/24 Tr. at 18-19.) Counsel told the jury:

> We have a system of justice, and today you are that system. It demands compensation for what's been taken from her. Think about what was taken from her and what she can never get back, her innocence, her choice of who her first time would be with, her feelings of safety and security in this world for the rest of her life. That was taken from her.
>
> Paintings get sold for 50 to $100 million and we don't bat an eye because they're unique. How unique and important is what was taken from [A.T.] to her? How much do we value protecting children in this society from that? She lost her ability to feel safe in the world. This is the one life she gets. We don't get another one, and hers, 13 years and two months in, started with being violently raped in the place she was supposed to be helped and kept safe.

( *Id.* at 38-39.) Counsel later said:

> We're not asking for sympathy, ladies and gentlemen. We're asking for justice. I told you in opening because the evidence in this case about what happened and what they knew you get to consider and assess punitive damages. That's called — you have to find willful and wanton conduct which means an utter indifference to or conscious disregard for a person's safety and the safety of others. I don't know what this conduct

is if it's not a complete indifference to [or] a conscious disregard for safety. I cannot conceive of a more outrageous and egregious conduct than this in a civil trial context.

Here's what I suggest: ask yourself — consider all the evidence and ask yourself a question. Can you imagine anybody, if they knew what goes on at this place, what their real priorities are, what they allow to go on, if you think anyone would bring their child there? That should answer this question for you.

Think about this a minute from a child's perspective. They're scared. They're taken away from their families. They're surrounded by chaos and danger, no one to turn to, and then something like this happens.

Today you are the voice of this community, and today you get to decide if you want to send a message about whether this is acceptable. And again, I am not asking you to make a decision based on passion. I'm asking you to make a decision based on logic and reasoning from what you've seen.

(*Id.* at 41-42.) Later, plaintiff's counsel said:

They're paid to protect and they profit from neglect. It's profits over patients. For all the reasons you've seen in this case, I told you we were going to ask for a very, very large number in punitive damages, we ask you to assess punitive damages in the amount of $500 million. Total damages of $575 million. This is about deterring the industry. You can't do that with 1 or $200 million. The health-care industry is the biggest industry in the country. The number should probably start with a B if we're being honest, but that's not what we're asking you to do, but you can make the decisions completely on your own, as you should.

(*Id.* at 47.) In rebuttal, plaintiff's counsel argued:

It's a very important case, and I think your decision here can make a big change in a lot of very vulnerable people's lives, not only here but across the country.

(*Id.* at 85.) Finally, plaintiff's counsel closed rebuttal by arguing:

Ladies and gentlemen, the children on that unit today and tomorrow and the next day, they have — they have no voice. They're sealed up in

that unit, and this company, this corporation can do whatever they want and the only people that know about it are the kids. But today they have a voice. They have a voice today. That voice is all of you. They have a voice.

You get to speak for them today to everybody. And ladies and gentlemen, tell Pavilion, tell Pavilion on behalf of these children and children everywhere else, please tell them that their conduct of putting profits over patients is unacceptable. Tell them with your verdict. Tell them loud and clear so they hear it and tell them loud enough so that they actually do something about it.

(*Id.* at 92-93.)

The Pavilion made exactly zero objection to these arguments at trial. In fact, during the entirety of plaintiff's closing and rebuttal arguments the Pavilion only made a single objection, which the Court sustained. (*Id.* at 25.) Thus, the Pavilion's prejudice claims about these arguments are forfeited. *Jacobs v. Union Pac. R.R.*, 291 Ill. App. 3d 239, 243 (5th Dist. 1997) ("A party cannot sit on his hands and let perceived errors into the record and complain of those errors for the first time in a post-trial motion.").

American courts require litigants to make contemporaneous objections to evidence or arguments they think are improper. Illinois is in accord. *See People v. Denson*, 2014 IL 116231, ¶¶19-21; *Allen v. Sarah Bush Lincoln Hosp.*, 2021 IL App (4th) 200360, ¶¶ 191-206. The "contemporaneous-objection rule prevents a litigant from 'sandbagging' the court." *Puckett v. United States*, 556 U.S. 129, 134 (2009). Yet, sandbagging is what the Pavilion appears to have admitted to doing. At trial, after sitting idly by while all of these arguments were made, Pavilion's counsel moved for a mistrial outside of the presence of a jury. (3/28/24 Tr. at 50.) When the Court

17

inquired if a mistrial was the only cure available because counsel didn't timely object, the following exchange took place.

> The Court: Just so I'm clear, the only thing to do is a do over. There's nothing — should I have stepped in at some point and stopped the arguments?

> Counsel: I'm in the unique spot of doing the motion for a mistrial as directed by appellate counsel, and I was not making a strategic decision — I was not making strategic decisions about whether to object. I just wanted to put all of that on the record, and I — if the Court believes it is necessary that a curative instruction, should they have any questions about punitive damages, which they may, would be — would be warranted at that time.

> The Court: So it's someone else's rope-a-dope strategy?

> Counsel: No comment.

(*Id.* at 114.) It is difficult to believe that the marching orders from appellate counsel were for trial counsel to sit on their hands, not make strategic decisions about objecting, and then only *after* closing arguments (not to mention after seven days of trial, including the testimony of a juvenile rape victim) ask for a new trial. This type of gamesmanship cannot be rewarded with a do over.

As the Pavilion admits, for a new trial to be awarded the unobjected-to arguments must be "plain error." (Reply filed 7/23/24 at 13.) Plain error occurs "(1) when 'a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error,' or (2) when 'a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness

of the evidence." *People v. Coats*, 2018 IL 121926, ¶ 9. As discussed throughout this order, the evidence in this case was not closely balanced, so any plain error would need to fall in the second category.

But none of the complained-of-arguments, nor their cumulative effect, were so erroneous that they threatened the integrity of the judicial process. Due process only prohibits *undue* prejudice, not any prejudice. Arguments create undue prejudice where they "cast a negative light upon a defendant for reasons that have nothing to do with the case on trial." *People v. Gordon*, 2017 IL App (3d) 140770, ¶ 25. But this does not mean that counsel must suddenly become "Caspar Milquetoasts [and] tell its story in monotone." *United States v. Cross*, 308 F.3d 308, 325 (3rd Cir. 2002). The Pavilion chose to administer and manage the juvenile unit in the understaffed, haphazard manner presented at trial. It was not unfair for plaintiff's counsel to strenuously argue that the Pavilion should be accountable for that choice. If and when the Pavilion's attorneys thought those arguments crossed the line it was incumbent on them to object. It was not the Court's task to do their job for them.

The Pavilion makes two other prejudice arguments that must be addressed. They claim it was error to allow any mention of the Pavilion's corporate parent, UHS. Trial courts must be mindful that juries sometimes "use their verdicts to express biases against big businesses, particularly those without strong local presences." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2002). The Court, during motions in limine, attempted to confine the proofs in this case to A.T. and the Pavilion, particularly since UHS is not a party to this action. The Court said: "I don't

know if it will be possible to completely bar any reference to UHS, but . . . what I am wanting to avoid is the notion . . . that UHS is this corporate boogeyman kind of behind all of this." (2/26/24 P.M. Tr. at 100-101.). At the same time, the Court has no duty to sanitize ugly facts for the Pavilion: the fact that UHS directed the staffing levels (3/25/24 Tr. at 247) was relevant to the case and did not unfairly prejudice the Pavilion.

The Pavilion also contends the size of the jury's award "confirms" they acted out of unfair prejudice. (Mot. at 42.) This type of argument is nothing more than circular reasoning. When one looks at what the jury actually did, it does not support the notion that this was a runaway jury that simply handed the plaintiff a blank check. First, the jury awarded the plaintiff less than she requested for both compensatory and punitive damages. Second, and more striking, the jury found against the plaintiff and in favor of the Pavilion on the fraud claim. The Court does not believe (as the Pavilion suggests) that the same jury, in the same verdict, reached both a sound, well-reasoned verdict on the fraud claim yet became unhinged on the negligence claim. As discussed below, the jury's award is large but it is not a *per se* confirmation of improper prejudice.

The Pavilion is not entitled to a new trial.

C

Having rejected the Pavilion's arguments for judgment notwithstanding the verdict and for a new trial, the Court must next assess whether the jury's award can stand. The jury awarded $60 million in compensatory damages and $475 million in

20

punitive damages. The Pavilion argues that both of these figures are excessive and should be remitted.

"The practice of ordering remittitur of excessive damages has long been recognized and accepted as part of Illinois law." *Best v. Taylor Mach. Works*, 179 Ill. 2d 367, 412 (1997). An award is excessive "if it falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience." *Richardson v. Champan*, 175 Ill. 2d 98, 113 (1997). However, judges may not simply substitute their judgment for a jury's verdict. "Illinois courts have repeatedly held that the amount of damages to be assessed is peculiarly a question of fact for the jury to determine and that great weight must be given to the jury's decision." *Snelson v. Kamm*, 204 Ill. 2d 1, 36-37 (2003) (citations omitted). "There is no mathematical formula for deciding whether an award is fair and reasonable." *Epping v. Commonwealth Edison Co.*, 315 Ill. App. 3d 1069, 1072 (1st Dist. 2000). Instead, this Court's task in assessing both compensatory and punitive damages is to determine if the jury's verdict "falls within the flexible range of conclusions that can reasonably be supported by the facts." *Best*, 179 Ill. 2d at 412.

1

The compensatory damages in this case are significant. The jury awarded a total of $60 million, itemized as $20 million for loss of normal life and $40 million for pain and suffering. Both of these categories of recovery stem from the sexual assault of A.T. and the injuries she endures. "When reviewing an award of compensatory damages for nonfatal injury, a court may consider, among other things, the

21

permanency of the plaintiff's condition, the possibility of future deterioration, the extent of the plaintiff's medical expenses, and the restrictions imposed on the plaintiff by the injuries." *Richardson*, 175 Ill. 2d at 113-114.

Pain and suffering, particularly the kind of internal emotional and mental suffering present in this case, is inherently idiosyncratic because human beings are inherently idiosyncratic. Comparing and contrasting the unique suffering of one individual to another is a fool's errand. Thus, "the clear weight of Illinois authority has been to reject the 'comparison' concept" when it comes to compensatory damages. *Epping v. Commonwealth Edison Co.*, 315 Ill. App. 3d 1069, 1072-73 (1st Dist. 2000).

> This case is not about an injury to an arm or a leg. It is about the nature and extent of injuries to a particular woman. It is about the life she is required to lead because of the defendant's negligence. We will not compare.

*Id.* at 1073.

"Absent a clear indication in the record that the jury failed to follow some rule of law or considered some erroneous evidence, or that the verdict was the obvious result of passion or prejudice, a reviewing court will not upset the jury's assessment of damages." *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 247 (2006). The jury heard evidence of substantial damage resulting from the rape.

A.T. was a virgin before the attack. (3/22/24 Tr. at 173.) After the attack she has nightmares about four times a week and, even though D.C. is now deceased, she said she has "a certain dream where he comes back for me once he found out that I told on him." (*Id.*) They are "vivid nightmares of him killing her" by stabbing her or lighting her on fire. (3/25/24 Tr. at 42.) She wakes from these nightmares short of

breath and discovers she has wet the bed causing her to wear a pull-up to bed every night. (3/22/24 Tr. at 174.) She suffers fear, agitation, paranoia, low self-esteem, mistrust — particularly of men, disassociation, and depression. (3/25/24 Tr. at 19, 43-52.) Dr. Lauren Richerson, a clinical psychologist, believes A.T. has "severe PTSD with dissociative symptoms as a result of getting raped at the Pavilion." (*Id.* at 60.) When asked during her testimony about flashbacks of the incident that night, A.T. began sobbing and said, "I don't want to do this no more," and promptly left the courtroom. (3/22/24 Tr. at 163-164.) In this Court's view, this was not a staged or exaggerated act but clear evidence of a teenage girl still struggling with the effects of a traumatic event.

While post-trial the Pavilion appears to have accepted — even endorsed (*see* Post-Trial Motion, filed 6/21/24, at 44-52) — the significant emotional harm that has befallen A.T., its strategy at trial was markedly different. At trial it significantly minimized the harm to A.T., primarily through the opinions of Dr. William Giakas, a psychiatrist. Dr. Giakas testified that he believed "whatever emotional trauma occurred for [A.T.] has subsided a long time ago." (3/27/24 Tr. at 152.) While he thought "memories of that [night] are always going to bother her," he believed the distress lasted only a matter of "months" and "any stress . . . should have or has completely subsided." (*Id.* at 153.) During his deposition, Dr. Giakas testified:

> I think the event itself was actually — in the scheme of traumatic rape, it was actually quite minor. But it still had some impact — I'm going to say it had some impact; I just think it was a minor impact.

(P. Ex. 90.) Confronted with this testimony, Dr. Giakas testified at trial:

23

> What I'm saying today is that rape is a violent act. And, you know, she's
> a minor who was raped. And I'm not sure exactly how that came out of
> my mouth, but I'm not saying this was minor.

(3/27/24 Tr. at 149.) It is disingenuous to suggest that Dr. Giakas did not minimize
A.T.'s suffering or that he simply testified that A.T. is a minor who was raped. He
was clear in his belief that the rape had a minor impact on her. The jury clearly
disagreed.

The jury's difficult task was determining what A.T.'s suffering is worth. Even
though this Court sat through the same trial and heard the same evidence it is in no
better position to assess the value of the compensatory damages to be awarded for
the harm inflicted by a rape of a 13-year old girl than the jury. Judges "are neither
trained nor equipped to second-guess those judgments about pain and suffering and
familial losses incurred by other human beings. To pretend otherwise would be sheer
hubris." *Barry v. Owens-Corning Fiberglass Corp.*, 282 Ill. App. 3d 199, 207 (1st Dist.
1996).

The Pavilion argues that the jury's compensatory award is excessive because
A.T. is "likely to continue experiencing improvement and can benefit from additional
treatment." (Post-Trial Motion, filed 6/21/24, at 45.) While one hopes that A.T. enjoys
a life of continued improvement, a significant complicating factor for her recovery is
the fact that her injury derives from a place that was supposed to be helping her with
already-existing mental health issues. Improvement is at least partially a function of
treatment and A.T.'s future mental health treatment will be hindered because she
was harmed by a mental health treatment facility. Sexual assault, in any context and

in any institution, is a grave atrocity. That it happened here because of the grave negligence of an institution that should have protected the victim only exacerbates the corresponding harm because it hinders future treatment.

A trial judge cannot allow an excessive verdict to stand but "must act to correct the injustice." *Best*, 179 Ill. 2d at 410. This Court cannot find an injustice when it comes to the jury's substantial compensatory damage award. Make no mistake, the compensatory award here is large by any measure. But large does not mean excessive. Excessiveness is a function of proportionality. Great harms demand great awards. The forcible rape of this vulnerable 13-year-old girl inflicted great harm, which the jury assessed at $60 million. The Court declines the invitation to reduce the jury's compensatory damages award.

2

"Punitive damages are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future." *Lawlor v. N. Am. Corp. of Ill.*, 2012 IL 112530, ¶ 58 (quotation omitted). "It has long been established in this State that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186 (1978). The entire point of punitive damages is to make "a warning and example" out of a defendant, *id.*, so as to "punish the wrongdoing and serve as a deterrent to antisocial behavior in the future." *Turner v.*

25

*First Bank, N.A.*, 363 Ill. App. 3d 1150, 1159 (5th Dist. 2006). At the same time, "courts must take caution to see that punitive damages are not improperly or unwisely awarded." *Kelsay*, 74 Ill. 2d at 188. The Pavilion argues against the punitive award in this case for multiple reasons.

a

The Pavilion argues that the jury's decision to award punitive damages is against the manifest weight of the evidence. "Whether the facts of a particular case justify the imposition of punitive damages is properly one of law." *Kelsay*, 74 Ill. 2d at 186. The Court was tasked with a similar question during the hearing of February 26, 2024, because before punitive damages can be sought Illinois law requires plaintiff to establish "a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." 735 ILCS 5/2-604.1. (*See also* 2/26/24 A.M. Tr. at 121-125.) The difference now is whether the facts adduced at trial, as opposed to those tendered prior to trial, are sufficient to justify the jury's verdict.

If anything, the trial record is *more* supportive of punitive damages than the pretrial record. The evidence was overwhelming that the attack on A.T. was the direct consequence of the utter disregard the Pavilion had for a pediatric unit that was already out of control before either A.T. or D.C. were admitted as patients. That profits controlled over patient safety was resoundingly clear at trial. On the cold record before trial, this point was not as obvious to the Court; but at trial it came through loud and clear.

Perhaps most demonstrative of this phenomenon was the testimony of Ms. Creed. Recall she was the interim chief nursing officer who had worked at the Pavilion for 12 years, and had been a nurse for 29 years. (3/25/24 Tr. at 242.) She was asked about her performance goals, including: filling more beds; monitoring employees per occupied bed striving for at or below budget; reducing overtime; increasing the patient census; and increasing a patient's length of stay. (*Id.* at 273-282; P. Ex 20-6.) She answered that "there wasn't really anything that I could personally do to increase length of stay" (*id.* at 276) and that she "didn't take that to heart. I'm a nurse, always a nurse. My patients are the first priority, and that's all I can say about that, mm-hmm." (*Id.* at 282.) Unspoken, however, was the emotion she testified with. Her sadness at having been tasked with the impossible was unmistakable.

There is nothing wrong with a business considering the bottom line. However, when consideration of that bottom line recklessly tasks the on-the-ground employees — who staff and monitor the unit — with the impossible, the unavoidable result is the "wanton disregard for the rights of others." *Kelsay*, 74 Ill 2d at 186. People get hurt. Unfortunately, A.T. was hurt by the Pavilion's conduct. "A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 423 (2002). The jury had ample reason to punish the Pavilion for its conduct.

b

The remaining question is if the punishment was too great. Citing both Illinois common law and the U.S. Constitution, the Pavilion argues the punitive damages award is excessive. Under our common law, "Illinois courts look to a fact-specific set of relevant circumstances, including the following: (1) the nature and enormity of the wrong, (2) the financial status of the defendant, and (3) the potential liability of the defendant." *Turner*, 363 Ill. App. 3d at 1161. The Supreme Court has offered similar "guideposts" for determining a constitutional violation: "(1) the degree of reprehensibility of the defendant's conduct, (2) the disparity between the harm or potential harm suffered by the plaintiff and the amount of punitive damages, and (3) the differences between this remedy of punitive damages and the civil penalties authorized or imposed in comparable cases." *Doe v. Parrillo*, 2021 IL 126577 ¶ 43 (cleaned up). This Court must confess it has difficulty conceptually distinguishing between the common law's "nature and enormity of the wrong" and the constitutional "reprehensibility" test. In fact, the Supreme Court has said the "degree of reprehensibility" takes account of "the enormity of the offense" and principle that "some wrongs are more blameworthy than others." *BMW of N. Am. v. Gore*, 517 U.S. 559, 575 (1996). Regardless, reprehensibility remains the "most important indicium of the reasonableness of punitive damages." *Id.*

Nevertheless, gauging the reasonableness of a punitive damages award remains "inherently imprecise." *Parrillo* at ¶ 45. It is "impossible to establish a precise formula to determine whether a particular award is excessive or not." *Snelson*,

204 Ill. 2d at 37. Asking whether an award shocks the judicial conscience feels akin to beauty being in the eye of the beholder or obscenity being "I know it when I see it." *Jacobellis v. Ohio*, 378 U.S. 184, 197 (Stewart, J., concurring). Justice Scalia thought determining the reasonableness of punitive damages was "insusceptible of principled application." *Gore*, 517 U.S. at 599 (Scalia, J., dissenting). Justice Ginsburg opined that we only have "a vague concept of . . . a 'raised eyebrow' test." *Id.* at 613 (Ginsburg, J., dissenting). Amorphous guideposts "do little to aid the decisionmaker in its task" of assessing the reasonableness of large punitive damages awards. *State Farm*, 538 U.S. at 418. It is, however, this Court's task to do so.

The trial record is devoid of any evidence that the Pavilion recognizes the gravity of its wrongdoing. No meaningful changes were made after the rape. If A.T. and D.C. were admitted today, the same horrible outcome seems likely. Yet, throughout this litigation, the Pavilion seems oblivious to its own failures Over and over it argued to the jury its pediatric unit was in line with the "industry standard." (3/28/24 Tr. at 53, 54, 58, 67, 68.) While this is certainly a dubious claim, if it was true it would provide the best possible rationale for leaving the jury's enormous exemplary award alone. Nevertheless, the Court believes it is duty-bound to reduce the award.

As stated above, punitive damages are available when the wrongdoer acts with "actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Lawlor* at ¶ 58. In other words, punitive damages covers a range of potential mental states by the wrong doer. An "intentional, premeditated scheme to harm" is

29

at one end of the range, while wanton disregard is at the other. *Id.* at ¶ 61. In this case, there is ample evidence of the Pavilion's wanton disregard but there is no evidence of actual malice or an intent that A.T. be harmed. Therefore, the punitive damages award must be "on the low end of the scale." *Id.*

Determining that scale is no easy task. The parties' opinions on that scale, unsurprisingly, are widely divergent. (Compare Pavilion's motion filed 6/21/24 at 67-68 (suggesting the $8 million award from a different case as the outermost limit) with plaintiff's response filed 7/8/24 at 50 (pointing to a $485 million verdict in another case as the most analogous outcome).) One legal publication recently reported that the "highest total Illinois verdict for an individual plaintiff" was $363 million, made up of $38 million in compensatory and $325 million in punitive awards. *Illinois Defense Counsel Quarterly*, Second Quarter 2024 at p. M-4 (citing Cook County Jury Verdict Reporter Published 3/17/2023). This Court will accept that award of $325 million in punitive damages as the upper end of the scale. The bottom end of the scale for this case may be a one-to-one ratio with compensatory damages. *See Parrillo* at ¶ 44 (making a comparison between compensatory and punitive damages has a "long pedigree in legal scholarship"). At oral argument, the Pavilion argued that a one-to-one ratio is the outermost point for non-intentional, non-premeditated conduct. (8/1/24 Tr. at 23.)

This Court, however, believes that the punitive aims of "deterrence and retribution" requires more than a one-to-one ratio. *State Farm*, 538 U.S. at 417. There is no "bright-line ratio which a punitive damages award cannot exceed." *Id.* at 425. A

"greater ratio is appropriate" when "the defendant's conduct is particularly egregious and the plaintiffs harm arose from a physical assault or injury." *Parrillo* at ¶ 55. The Pavilion maintains its "conduct was not reprehensible or at worst minimally reprehensible." (Mot. at 66.) It argued at trial and continues to argue that D.C. is the only reprehensible actor, after all it was D.C. who intentionally spilled water, thereby distracting staff for "a few seconds" and allowing him to assault A.T. (Reply. at 45-46.) This is a minimization. If all it takes for one patient to forcibly rape another is a spilled cup of water this speaks volumes about the grossly-negligent monitoring already in place. It also ignores the alarming behavior that led to the spilled water. Yes, D.C. was the most reprehensible actor but it was the Pavilion that acquiesced control of the pediatric unit to him well before the rape occurred. The Pavilion's conduct was reprehensible.

Determining the appropriate ratio between compensatory and punitive damages is a "nuanced and fact-intensive" one. *Parrillo* at ¶ 55, n. 3. This Court gave great consideration of applying a treble damages ratio, which has a long history of application. *See Gore* at 580-81; *Parrillo* at ¶ 46. However, given the already significant compensatory award in this case, the Court believes doubling the compensatory award is sufficient to satisfy the punitive goals of retribution and deterrence. This Court recognizes the enormity of reducing a jury award by well over a quarter billion dollars with the stroke of a pen and does not do so lightly. The punitive damages should be remitted to $120 million.

c

There is one last complicating consideration to remittitur. "A remittitur is an agreement by the plaintiff to relinquish, or remit, to the defendant that portion of the jury's verdict which constitutes excessive damages and to accept the sum which has been judicially determined to be properly recoverable damages. It is a judicial determination of recoverable damages and should not be construed as an agreement between the parties or a concession by the plaintiff that the damages were excessive." *Tri-G* at 253. This Court "does not have the authority to reduce the damages by entry of a remittitur if the plaintiff objects or does not consent. The trial court must afford the plaintiff the choice of agreeing or refusing to the entry of a remittitur, with the proviso that the plaintiff's refusal to agree to the entry of a remittitur will result in the ordering of a new trial." *Id.* at 253-54. This new trial, however, seems somewhat illusory since any punitive recovery over $120 million will again be remitted, leaving the only result for the plaintiff at a new trial to recover the same or less. Nevertheless, it is the plaintiff's right to choose. The plaintiff shall have 21 days from the filing of this order to make the election.

III

In her post-trial motion, the plaintiff seeks three things. First, she asks for costs and the parties have come to an agreement about what costs are recoverable under 735 ILCS 5/5-108. They agree that a total of $5,144.19 is recoverable. (*See* Mem. filed 8/23/24 providing details.)

Second, the plaintiff asks for prejudgment interest on the compensatory damages, pursuant to 735 ILCS 5/2-1303(c), in the amount of $8,630,000. The Pavilion does not contest this calculation, however, it does contend that prejudgment interest is unwarranted because § 2-1303(c) is unconstitutional. While the Court appreciates the parties' efforts in briefing this issue, it is an academic one at this stage. As the Pavilion recognizes, Illinois appellate courts have found the statute constitutional. *See Cotton v. Coccaro*, 2023 IL App (1st) 220788; *First Midwest Bank v. Rossi*, 2023 IL App (4th) 220643; *Wilcox v. Advocate Condell Med. Ctr.*, 2024 IL App (1st) 230355; *Galich v. Advocate Health & Hosp. Corp.*, 2024 IL App (1st) 230134. While the Pavilion is free to disagree with the First and Fourth Districts, this Court is not. "A decision of the appellate court, though not binding on other appellate districts, is binding on the circuit courts throughout the State." *State Farm Fire & Casualty Co. v. Yapejain*, 152 Ill. 2d 533, 536 (1992). Thus, until the Fifth District or a higher court says otherwise, it is this Court's "absolute duty . . . to follow the decisions of the appellate court." *In re A.A.*, 181 Ill. 2d 32, 36 (1998). Apply § 2-1303(c) to this case, the plaintiff is awarded prejudgment interest in the amount of $8,630,000.

Finally, the plaintiff seeks postjudgment pursuant to 735 ILCS 5/2-1303(a). The Pavilion's only opposition is that the Court reduce postjudgment interest to "reflect any relief granted on Pavilion's Post-Trial Motion." (Resp. filed 7/8/2024 at 18.) The Court agrees that the plaintiff is not entitled to postjudgment interest on the remitted amount, however, she is entitled to postjudgment interest on the other judgment, costs and interest accrued since March 28, 2024, the date of the jury's verdict.

IV

In summary, the Pavilion's motion is granted in part. The jury's punitive damages award is remitted to $120 million. In all other respects that motion is denied. The plaintiff's motion is allowed. The plaintiff is entitled to recover costs of $5,144.19, prejudgment interest of $8,630,000, and postjudgment interest as set forth above.

October 10, 2024     /s/ Jason M. Bohm
Date           Circuit Judge